JOZWIK v. EMPLOYMENT SECURITY COMMISSION

1. Unemployment Compensation—Unemployment Status.

Plaintiffs, employees of a line clearance and construction company which had a contract with the Detroit Edison Company, were not entitled to unemployment benefits where the union that the plaintiffs belonged to also had members doing similar work employed by Detroit Edison, the union struck Edison, plaintiffs' union had told its members not to work on Edison property, the plaintiffs' employer consented to the union's demand because the labor contract between plaintiffs' union and employer provided that the union could remove its members who were employed by the plaintiffs' employer in case of a strike by the union against a company in the area, work was available for the plaintiffs during the Edison strike, the employer's general superintendent instructed the job supervisors not to tell the workmen not to work, the plaintiffs reported to work but were told by their union stewards not to go to work, the plaintiffs were informed of available work on non-Edison property at locations both within and out of this state but the work was not accepted because of the distance to the work and because of a lower pay rate, and an officer of the plaintiffs' union testified that plaintiffs could work on Edison property if so ordered, but admitted that it was assumed that both the union and Edison did not want the men working on Edison property during the strike, because the plaintiffs were not unemployed, as defined by the applicable statute in that their failure to work was not caused by the failure of their employer to furnish full time work (MCLA § 421.48).

References for Points in Headnotes

[1] Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes. 28 ALR2d 287.

[1, 2] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 36.

[3] 29 Am Jur 2d, Evidence §§ 496, 497.

2. Unemployment Compensation—Requirements—Unemployment Status—Statutes.

> A claimant is not entitled to unemployment benefits unless he first establishes that he was unemployed; unemployment is the indispensable essential element or ingredient which brings into being and sets into motion all of the other provisions of the Employment Security Act (MCLA § 421.1 *et seq.*).

3. Evidence—Hearsay—Exceptions—Union Officials.

> Testimony by officer of plaintiff unemployment benefit claimants' employer concerning statements made by the business manager of the claimants' union and the union's steward relating to the claimants' employment was admissible where the business manager and the steward were, by a union agreement, authorized to speak for the claimants in matters pertaining to employment.

Appeal from Wayne and Macomb, Edward S. Piggins and Alton H. Noe, JJ. Submitted Division 1 December 9, 1970, at Detroit. (Docket Nos. 7911–7913, 8290, 8291.) Decided February 16, 1971.

Claim by Alfred Jozwik, Ronald W. McCoy, Melvin Schaffhauser, Claude H. Breiholz, and Darrel G. Dunn for unemployment benefits against L. E. Myers Company. Benefits denied by the Employment Security Commission and the Employment Security Commission Appeal Board. Claimants Jozwik, McCoy and Schaffhauser appealed to the Wayne Circuit Court. Affirmed. Claimants appeal. Claimants Breiholz and Dunn appealed to the Macomb Circuit Court. Affirmed. Claimants appeal. Cases consolidated. Affirmed as to all claimants.

*Rothe, Marston, Mazey, Sachs & O'Connell* (by *Rolland R. O'Hare*), for plaintiffs.

*Butzel, Eaman, Long, Gust & Kennedy* (by *Leslie W. Fleming, John J. Spittler,* of counsel), for defendant L. E. Myers Company.

Before: DANHOF, P. J., and HOLBROOK and VAN-
DER WAL,* JJ.

HOLBROOK, J. This appeal involves the rights of
five plaintiffs, employees of defendant, the L. E.
Myers Company, as claimants under the provisions
of the Michigan Employment Security Act.[1] Plain-
tiffs were denied unemployment benefits by deter-
mination of the commission, a redetermination of
the commission, and after consolidation of all five
claims, a decision by a referee of the commission.[2]
The referee, after a hearing and making a finding of
facts, denied unemployment benefits under the de-
termination that plaintiffs were ineligible under the
terms of the act. Plaintiffs appealed to the Michi-
gan Employment Security Commission Appeal
Board which affirmed the decision and findings of
the referee. An appeal was then taken from the
appeal board by plaintiffs Jozwik, McCoy, and
Schaffhauser to the Circuit Court for Wayne Coun-
ty[3] and by Breiholz and Dunn to the Circuit Court
for Macomb County. The Honorable Edward S.
Piggins, Circuit Judge of the Wayne Circuit and
the Honorable Alton H. Noe, Circuit Judge of the
Macomb Circuit, each filed an opinion affirming the
Appeal Board of the Michigan Employment Secur-
ity Commission. Plaintiffs appealed to this Court
by right and the cases were consolidated by proper
order. Plaintiffs raise two issues which we restate
as follows:

(1) May the Employment Security Commission
deny a claim for benefits when it finds that the claim-

---

* Circuit judge, sitting on the Court of Appeals by assignment.
[1] PA 1936 (Ex Sess), No 1, as amended, MCLA § 421.1 et seq.
(Stat Ann 1968 Rev § 17.501 et seq.).
[2] MCLA § 421.32a (Stat Ann 1968 Rev § 17.534[1]).
[3] MCLA § 421.38 (Stat Ann 1968 Rev § 17.540).

ants are not "unemployed" within the meaning of § 48⁴ of the Michigan Employment Security Act?

(2) Are the findings of fact made by the appeal board supported by competent, material, and substantial evidence on the whole record?

The two circuit courts, in considering the appeal of plaintiffs, were required to review the proceedings in accordance with the provisions of § 38 of the act which provides in part as follows:[5]

"The circuit court of the county in which the claimant resides, or, if no claimant is a party to the case, the circuit court of the county in which the employer's principal place of business in Michigan is located, or in any case the circuit court for the county of Ingham, shall have power to review questions of fact and law on the record made before the referee and the appeal board involved in any such final order or decision of said appeal board, and to make such further orders in respect thereto as justice may require, but said court may reverse such order or decision only if it finds that such order or decision is contrary to law or is not supported by competent, material and substantial evidence on the whole record."

We have reviewed the findings of the referee in the matter, and because we believe they are accurate, we reiterate them here as the pertinent facts in this case.

"The L. E. Myers Company (hereinafter sometimes referred to as 'Myers') of Chicago, Illinois, with a branch office at Clawson, Michigan, is engaged in line clearance (tree trimming), and construction and maintenance of overhead power lines. In this activity, Myers operates under contracts with utility companies in various parts of the United

---

4 MCLA § 421.48 (Stat Ann 1968 Rev § 17.552).
5 MCLA § 421.38 (Stat Ann 1968 Rev § 17.540).

States.    In 1966, Myers had such a contract with the Detroit Edison Company (hereinafter sometimes referred to as 'Edison') for the southeastern and thumb areas of the State of Michigan, performing said services at various locations on Edison properties.

"Myers, as a member of the American Line Builders Chapter, National Electrical Contractors Association, had a contract with Local #17, International Brotherhood of Electrical Workers, AFL-CIO (hereinafter referred to as the 'union') (Exhibit #13); this contract was for the one-year period from May 31, 1965, through May 29, 1966.    Myers' employees (the line clearance and power line workers) were members of said Local #17 (Exhibit #12); this Myers' contract with Local #17 runs from October 4, 1965, through October 6, 1968, except that either party may reopen the agreement prior to October 2, 1966, and October 1, 1967, 'for the purpose of discussing wages and two economic items at each reopening'.

"Edison employees doing the same type of line clearance and power line construction and maintenance work, also belonged to said Local #17, IBEW.

"Although Edison and Local #17, IBEW, enjoyed a half century of favorable labor relations, with not a single work stoppage to mar that record, Local #17 and Edison came to a breaking point in the course of negotiations for a new contract in May, 1966, and Local #17 went out on strike against Edison on May 31, 1966.    The dispute was settled and the work stoppage ended on July 3, 1966.

"Myers was informed on May 27 of the impending strike to take place on May 31, 1966.

"Myers' contract (Exhibit #12) contains a provision for the arbitration of 'any difference (arising) under this agreement between an employee or a group of employees and the employer, or any misunderstanding, dispute or difference between the parties to this agreement involving the application or interpretation of the provisions of this agree-

ment' (providing for two grievance steps to be followed by the arbitration) ; it also provides that 'any ruling of the arbitrator shall be final and binding on both parties' (Article III, Employer Rights—Union Rights, § 1a). Subsection b of § 1 of said article III, reads as follows:

" 'The grievance procedure herein provided shall apply only to matters arising under this agreement, but shall not apply to matters of wages.'

"Section 8 of said article III reads as follows:

" 'This agreement does not deny the right of the union or its representatives to render assistance to other labor organizations within the jurisdiction of this local as provided and defined in this agreement, by removal of its members from jobs where necessary and when the union or its proper representative decides to do so; but no removal shall take place until notice is first given to the employer involved.'

"Employer submitted the union contract (Exhibit #12) in evidence, and pointed to the provisions, above quoted, of article III, as evidencing a 'no strike' agreement between the employer and the union, and as the basis of authority which the union had to 'pull off' the Myers' employees who belonged to Local #17 in sympathy with the Local #17 employees who were on strike with Edison.

"Employer showed that, under the authority of said proviso, the business manager of the union did make it clear to the employer that the union did not want its members who were line clearance and maintenance workers employed by Myers, to work on the jobs on Edison property during said strike. This attitude was expressed to employer prior to May 31 and was accepted by employer as formal notice per said contract; on the morning of May 31, employer recognized the union's right to remove its employees under the provisions of said union contract.

"Claimant's work was available with Myers, but the workers were not available—the work was

available throughout the time of said strike, and claimants proceeded with the work after July 3, 1966, when the strike was settled. Employer denied that the claimants were instructed by the employer not to work.

"Employer added that the business manager of Local #17 did not want the Myers' employees to work on the jobs on Edison property, and he said he will instruct the men not to work.

"On the morning of May 31, at 6 a.m., employer's general superintendent strictly instructed the job supervisors not to tell the Myers' employees not to work, because Myers was not stopping its jobs; also, that word from the union was, that the union was pulling its members off the Myers' jobs.

"The men reported for work on May 31, at their usual time between 7 and 7:30 a.m., but did not go to work because the union stewards told them not to go to work.

"Claimants showed that they had no instructions or directions from their union officials not to continue with their work on Myers' jobs on Edison properties, on May 31, 1966. Claimants testified that they were informed by their foreman and the general foreman on the morning of May 31, that they were not to proceed with their work on May 31 due to the strike of Edison employees, members of Local #17, IBEW. The foremen were 'working foremen' who also were members of Local #17.

· "Some testimony indicates that there was a 'picket' at some locations where the claimants normally met with their foremen to be taken by truck to the work site; the 'picket' consisted of one individual who was either nearby the said location, or in an automobile; he was recognized as a 'union' representative.

"The customary practice was for the employer to have its various crews meet at different locations, usually at a gas station, where they would gather and go by truck from there to the job sites where

they performed their services. The trucks were loaded the evening before at the Edison warehouse, by Edison employees, with Edison material to be used by the Myers' employees on the job sites. On the morning of May 31, there were trucks at these various locations where the crews were to gather, already loaded from the preceding Friday at the Edison warehouse with Edison material, ready to be driven to the job sites. Because of the strike on Monday, May 31, and the failure of the Myers' employees to proceed with the work, the trucks were returned to the Edison warehouses, there to remain during the strike.

"The foremen instructed the claimants and the other men who had reported for work on May 31, to take their personal belongings and turn in company property; and to leave their names, etc., where they could be contacted, since the length of the duration of the strike was uncertain.

"Employer showed that the claimants were told of other available work with the employer, on properties of other utility companies, at other locations in the State of Michigan and outside the State of Michigan; some of the claimants were offered such work. Such other work was not applied for or accepted, either or both because the work was in another area, some distance from their places of residence, and because the rate of pay was lower.

"During the Edison strike, there was some discussion between Myers and the union, of wage increases, etc., for Local #17 members who were employees of Myers; but no action was taken in these discussions because, in accordance with former practice, the Myers' employees were usually granted the same or comparable increases as were given to Edison employees performing similar work.

"When the Edison strike was settled on July 3, 1966, the negotiations between the union and Myers proceeded and a conclusion was reached in October 1966 whereunder Myers passed on to its employees, claimants included, members of Local #17, wage

increases and fringe benefits comparable to those obtained by the Edison striking employees. These increases in benefits were made retroactive to May 31, 1966. It was testified that this action was in accordance with a previous 'custom', 'to follow closely the pattern set by Edison', although in prior years the Edison employees won their wage increases, etc., without resort to a strike; the 'custom' was followed in 1966.

"The union business manager, James Oliver, testifying on behalf of the claimants, disputed the employer's testimony and said that Myers' employees could work on Edison property during the strike if Myers so ordered them to do.

"Under cross-examination, witness admitted that it was 'assumed', throughout the discussions between himself and Myers' officials, that it was a foregone conclusion that Edison would not want work done on its properties by the Myers' employees, in the event of a strike. Edison expressed such a wish, that the contractor's employees shall not work on Edison property during the strike. It was 'understood' as a 'logical assumption' that Local #17 employees would honor the strike by Local #17 against Edison; it was assumed all of Local #17 men would not work; but the union did not issue instructions to its members not to work.

"During the strike, Edison required some emergency work to be done on its property, and requested Myers to do this work, under its contract. This work involved protection of property and animals. Local #17 gave permission to Myers for the performance of this work (repairing fences and picking up scrap) by members of Local #17; and the union sent a man to watch as to what work was performed, and by whom, to make certain the work was not done by employees of Detroit Edison.

## "Findings, Reasons, and Conclusions

"The question in this case pertains to the unemployment of Myers' employees, the claimants here-

in, in the period from May 31 through July 3, 1966, and their eligibility for benefits in said period.

"Under the redetermination issued by the commission, the claimants were not considered unemployed in that period because of a labor dispute in active progress in the Myers' establishment, and because the labor dispute which was in active progress in the establishment of Edison was a labor dispute in an establishment which did not belong to the same employing unit (Myers) by whom the claimants were employed.

"Section 29 (8) of the act reads in part as follows:

" 'An individual shall be disqualified for benefits for any week with respect to which his total or partial unemployment is due to a labor dispute in active progress   *   *   *   in the establishment in which he is or was last employed, or to a labor dispute   *   *   *   in active progress   *   *   *   in any other establishment within the United States which is functionally integrated with such establishment and is operated by the same employing unit'.

"If it may be said that the operations of the Edison Company and the work of the Myers Company in said line clearance work is functionally integrated, it must nevertheless still be said that Edison is not operated by the 'same employing unit', the Myers Company.  The fact that both Edison and Myers hold union contracts with the same union, Local #17, is held immaterial and not controlling of the issue, because of the aforementioned provision of § 29 (8) of the act.

"The commission's finding that the claimants were not subject to a disqualification for benefits under the labor dispute provisions of the Michigan Employment Security Act, is therefore correct and must be upheld.

"Reference is made in the redetermination to the provisions of §§ 27(c) and 48 of the act.  Section 27(c) contains the formula for the computation and payment of benefits to an individual who is

otherwise qualified to receive unemployment compensation. Section 48 of the act defines the term 'unemployed' as having reference to any week during which the individual performs no services and with respect to which no remuneration is payable to him. Section 48, however, contains the following proviso:

" 'Provided that any loss of remuneration incurred by an individual during any week resulting from any cause other than the failure of his employing unit to furnish full-time regular employment shall be included as remuneration earned for purposes of this section and of subsection (c) of section 27 of this act.'

"It is found that the claimants did not proceed with their work on May 31, not for lack of available suitable work with their regular employer, but by reason of a common consent and understanding that they were not to work but to remain off work in support of their Local #17 members who were on strike with the Edison Company.

"It is very evident on the record of this case that the Local #17 members, employees of Myers, required no specific, strict, or forceful instruction from their union officials to advise them, or prevent them from proceeding with the Myers' work on Edison property. It is equally clear that it was entirely unnecessary for Myers to give their employees, members of Local #17, any other message than the fact that Local #17 members were striking against Edison, and that they, as members of Local #17, would not be permitted to work for Myers on Edison property, regardless of the willingness by the Myers Company to continue with the work. Union solidarity and sympathy support governed their actions. This attitude and understanding permeates the entire record in this appeal. Significantly, and regardless of the expressed or assumed wishes of Edison, the union, fully aware that the claimants could work under the Myers' contract because their work was available, gave no such

instructions to the claimants, to ignore the strike of the Local #17 members against Edison because there was no strike against Myers.   They gave no such instructions to the claimants, even though they knew, from past experience, from 'custom', that the Myers' employees, members of Local #17, would also be given wage increases and benefits attained for the Local #17 members, employees of Edison, by reason of said strike.

"In view of the authority contained in the union contracts (Exhibits #12 and #13), to remove Local #17 members, employees of Myers, in support of Local #17 members on strike with Edison, a duty devolved upon the union officials to instruct its Local #17 members who were employees of Myers, that the union does not want them to stop working because of the strike against Edison.   This was a responsibility that devolved upon the union because of the general 'logical assumption', the common belief, prevailing before the strike, as expressed by the union business manager on the record of this case, that, when the strike at Edison takes place, the Local #17 members employed by Myers will not be expected to go to work.

"In other words, the Myers' employees, members of Local #17, did not require any instructions not to work; they did require a specific instruction from their union, to work.   The failure to give those individuals and the claimants herein, such instructions, was tantamount to an act on the part of the union, removing them from their jobs in sympathy with the strikers.

"On the basis of the foregoing conclusions, it is found that the claimants herein did, in fact, lose the benefit of employment in available work and earnings with their regular employer, L. E. Myers Company, during the period of the Edison strike, for reasons other than the employer's failure to furnish full-time regular work, and they are held ineligible for benefits.   The commission's finding to this effect must be sustained."

## I

The appeal board's decision and the Wayne and Macomb County Circuit Courts' affirmances relied on the provisions of § 48 of the act in determining that the plaintiffs were ineligible for benefits. Section 48[6] states in part as follows:

"An individual shall be deemed 'unemployed' with respect to any week during which he performs no services and with respect to which no remuneration is payable to him, or with respect to any week of less than full-time work if the remuneration payable to him is less than his weekly benefit rate: Provided, That any loss of remuneration incurred by an individual during any week resulting from any cause other than the failure of his employing unit to furnish full-time, regular employment shall be included as remuneration earned for purposes of this section and of subsection (c) of section 27 of this act: Provided further, That the total amount of remuneration thus lost shall be determined in such manner as the commission shall by regulation prescribe. For the purposes of this act, an individual's weekly benefit rate shall mean the weekly benefit rate shown in the table in section 27(b), which is applicable to the individual.

\* \* \*

"An individual shall not be deemed to be unemployed during any leave of absence from work granted by an employer either at the request of the individual or pursuant to an agreement with his duly authorized bargaining agent, or in accordance with law."

Plaintiffs assert that they were eligible for benefits under the criteria established in § 28 and not disqualified under the provisions of § 29 of the act and were, therefore, entitled to the benefits pro-

---

[6] MCLA § 421.48 (Stat Ann 1968 Rev § 17.552).

vided under the terms of the act.   Plaintiffs cite the cases of *Great Lakes Steel Corporation* v. *Employment Security Commission* (1967), 6 Mich App 656, *affirmed* by the Supreme Court in 381 Mich 249, and *Bolles* v. *Employment Security Commission* (1960), 361 Mich 378, as authority for its position that § 48 of the act should not be used to defeat a claimant who is qualified under § 28 and not disqualified under § 29 of the act.   Neither case upholds plaintiffs' position on the law.   *Bolles, supra,* held simply that an individual who, during the course of a layoff, pursues self-employment out of which he derives little or no monetary gain is unemployed within the meaning of § 48.   *Great Lakes, supra,* involved a number of employees who, during the course of a labor dispute at the Great Lakes establishment, had obtained interim employment with other employers who subsequently laid them off for lack of work.   The Court held that the interim employer rather than Great Lakes was the "employing unit" within the meaning of that proviso in the act.

Judge Noe stated in his opinion:

"Under the above factual situation, there being work available and the men having left under instructions from their steward, they could not be considered to be unemployed within the provisions of the act.   This was the conclusion arrived at by the Michigan Employment Security Commission and there is certainly ample evidence in the record to sustain their interpretation of the acts of the claimants.

"It cannot be said that the evidence is undisputed, but this court finds that there was ample evidence in the original record and the presentation of competent material and exhibits from which the referee and appeal board could reasonably reach the conclusions and decisions which they did."

Judge Piggins stated in his written opinion:

"Section 28 provides in the first sentence 'An unemployed individual shall be eligible' and § 29 in its first line states, 'An individual shall be disqualified'. Clearly if a state of unemployment as defined by the act exists *and* the individuals involved are eligible in accordance with § 28 and are not disqualified in accordance with § 29, they are entitled to benefits. *But the primary mandatory prerequisite in any instance, the key that unlocks the flood gates, is the existence of a state of unemployment.* If no unemployment, then no benefits could arise, in any event, regardless of qualifications or eligibility. Unemployment is the indispensable, essential element or ingredient which brings into being and sets into motion all of the other provisions of the act. The operation of the act is dependent entirely upon the existence of a status of unemployment as it is defined in the act. Section 48 is one of the most vital sections of the act. It clearly and necessarily spells out and defines when an individual shall be deemed unemployed. The proviso in the first paragraph of § 48 is the key, 'provided, that any loss of remuneration incurred by an individual during any week resulting from any cause other than the failure of his employing unit to furnish full time, regular employment shall be included as remuneration earned for purposes of this section and of subsection (c) of section 27 of this act * * * '."

The case of *Employment Security Commission* v. *Vulcan Forging Company* (1965), 375 Mich 374, 378, persuades us to agree with Judge Noe and Judge Piggins.

"Our conclusion is buttressed by the second paragraph of the amended section [48] which, among other things, provides that vacation pay received for such periods of unemployment is considered remuneration in determining whether an employee is unemployed and in determining the amount of

unemployment compensation benefits, under § 27 of the act, to which he is entitled."

We rule that § 48 of the act is valid and applicable to the plaintiffs herein.

## II

Plaintiffs assert that the findings of fact made by the Michigan Employment Security Commission's referee were not supported by competent, material, and substantial evidence on the whole record. They also claim that the testimony of Mr. Dennis W. Chiesa, District Superintendent, and Mr. Donald E. Falls, in charge of the east division of Macomb County for defendant Myers, respectively, was hearsay.

Mr. Dennis W. Chiesa testified in part as follows:

"*Q*. Mr. Chiesa, again referring to Exhibits 12 and 13 (contracts with Union #17, IBEW): Who signed these contracts on behalf of the union?

"*A*. The business manager, James Oliver, and the president, Thomas J. Fairless.

"*Q*. James Oliver, as business manager, signed both contracts; is that correct?

"*A*. That is correct.

\* \* \*

"*Q*. Now, what, if anything, transpired on May 28?

"*A*. Well, on May 28, I received a call from James Oliver, business manager of Local Union 17, informing me that the Edison employees that are represented by Local 17 had voted to go out on strike and that he, Local Union 17, would be removing all of their hour employees off of the job on May 31.

"*Q*. Mr. Oliver, the business manager of Local 17, advised you on May 28, 1966, that Local 17 was striking Edison and that they were pulling all of

their members of Local 17 off of the work of L. E. Myers; is that correct?

"*A.* That is correct.

"*Q.* Proceed, please. Anything the following days?

"*A.* There was nothing more that had taken place until the morning of May 31.

\* \* \*

"*Q.* Now, Mr. Chiesa, on May 31 did anything transpire pertaining to this labor dispute?

"*A.* Well, on May 31, I had asked all of our supervisors to report to our Clawson office.

"*Q.* Clawson, Michigan?

"*A.* Clawson, Michigan, at 6 a.m. Due to the fact that we have headquarters scattered throughout the metropolitan area of Detroit, we had to have some plan to follow; and in talking to each of the supervisors I had specifically asked that they not tell their men not to go to work and that they should be instructed by Local Union 17 or its representatives.

"*Q.* Let me ask you this, Mr. Chiesa: Did L. E. Myers on May 31 have work available for its employees? Was there work at the present time?

"*A.* Yes, we had work at the present time.

"*Q.* Did any of your men actually go to work?

"*A.* I only know of three crews that went to work on Tuesday morning, May 31, and they were line clearance crews, working in the thumb area. Due to the fact that they are in that remote area, nobody had gotten word to them. These crews, as I recall, looking at our timesheets, had worked two hours, three hours, and four hours. Each crew came back into their headquarters, after being contacted by a representative of Local Union 17.

"*Q.* Then they could have continued working had they not been told to leave the job; is that correct?

"*A.* That is correct.

"*Q.* How many jobs were in progress in your district on May 31—the district that falls within the jurisdiction of Local 17?

"*A.* I would speak of the different headquarters we have, and we had approximately 14 different headquarters that we had people pulling out of.

"*Q.* Were there any pickets at any of these headquarters?

"*Mr. O'Hare:* I object to the question unless this man is shown to have personal knowledge of these facts.

"*Referee:* Do you know?

"*A.* The place that had two pickets is right in front of our Clawson office, at 801 North Rochester Road, Clawson, Michigan. At about two minutes before 7 a.m., on May 31, I had two pickets walking in front of our building.

"*Q.* Did you counsel or advise your general foremen as to how to proceed at their various job sites in the event that the men would not work?

"*A.* Yes, we did. We asked that they not tell the men, that they ask the steward, if there was one at that particular headquarters, to contact Local Union 17 and have them pass the word on. We specifically did not want some supervisors telling our people not to go to work.

"*Q.* And, I believe, you have testified that there was work available at all of the job sites, insofar as your company was concerned?

"*A.* Yes.

"*Q.* And on three of the job sites the men did work momentarily, but on the remaining job sites they did not go to work; is that correct?

"*A.* That is correct."

Mr. Donald E. Falls testified in part as follows:

"*Q.* Did you have work available for your men on the morning of May 31?

"*A.* Yes, there was work there.

"*Q.* Did your men accept that work?

"*A.* No.

"*Q.* Do you know why they didn't accept it?

"*A.* They were told by the job steward that there would be no work that day.

"*Q.* Who was the job steward, or what was his classification—or is he connected with the union?

"*A.* Yes. Do you want his name?

"*Q.* Yes.

"*Referee:* That's what he asked.

"*A.* Fred Harned.

"*Referee:* Fred what?

"*A.* Harned (*spelling*) H-a-r-n-e-d.

"*Q.* When you arrived at the location of your equipment after the 6 a.m. meeting, what were the circumstances there?

"*A.* Well, there was a picket on the job, and a lot of men standing around, wondering what they should or would do.

"*Q.* What, if anything, did you say to the pickets?

"*A.* I don't know as I said anything to the picket, which I might have said, 'Good morning'.

"*Q.* What, if anything, did you say to the job steward?

"*A.* I requested that he call Local 17 for instructions, and he asked me, 'What's coming off?'

"I said, 'You'll have to get your information from Local 17'.

"*Q.* And, to your knowledge, did he call someone

"*A.* Yes, he did.

"*Q.* And then did he come back to you and report anything?

"*A.* He said, 'It's all off; no work'."

Mr. James Oliver, the business manager of the union and Mr. Fred Harned, the steward for the union, were, by virtue of the union agreement, the representatives of the employees of the L. E. Myers Company, defendant, and were authorized to speak for them in matters pertaining to their employment. The statements made by Mr. Oliver to Mr. Chiesa and those made by Mr. Harned to Mr. Falls as

testified to by Mr. Chiesa and Mr. Falls were admissible as one of the exceptions to the hearsay rule. *Kalamazoo Yellow Cab Company* v. *Kalamazoo Circuit Judge* (1961), 363 Mich 384, 386.

Mr. Oliver testified in part as follows:

"*Q.* Do you remember, Mr. McCord, making any comment about whether or not L. E. Myers could, or other members of the American Line Builders Chapter would work if there was a strike at Detroit Edison?

"*A.* Well I believe during the course of the conversation it was understood by all parties, company and union, that they would probably not work on struck properties.

"*Q.* You say 'it was understood'. How did it get to be understood?

"*A.* Well through a course of conversation between the union, the line builders, and the Edison Company.

"*Q.* The Edison Company was represented at this meeting too?

"*A.* No they were not. When we have negotiations, the line builders, shall we say, negotiate with the Detroit Edison, with the wishes and demands of the union, and there is, shall we say, a two-way conversation back and forth, not on the same day, but various days.

\*　　\*　　\*

"*By Mr. Spittler:*
"*Q.* Now there has been testimony under oath, Mr. Oliver, that on May 31 the Myers trucks were loaded and ready to go to work, and you were also inferring that the weather was clear, no problem with the weather. Tell us clearly and unambiguously why the men did not go to work on the morning of May 31.

"*A.* Well I think it is quite self-explanatory.

"*Q*. Would you tell me why, not that you assumed somebody knew something, but tell me why the people didn't go to work?

"*A*. Because of the strike on the Edison property.

"*Q*. What are your men to do when there is a strike on the Edison property? Are they supposed to honor the members of their own union who are struck?

"*A*. It is a logical assumption, yes.

"*Q*. Then the answer to my question would be yes, is that correct? That they are supposed to honor a strike of their brothers, is that correct?

"*A*. Yes.

"*Q*. The answer is yes?

"*A*. Yes.

"*Q*. Now you have testified under oath that you did not pass the word, nor did any of your representatives pursuant to your instructions pass the word that these men were not to go to work, is that correct?

"*A*. That is correct.

"*Q*. Do you deny that on May 27 you had a telephone conversation with Frank Groleau telling him that your men were not going to work, none of the members of Local 17 were going to work?

"*A*. I do.

"*Q*. Do you deny that you had such a conversation on May 28 with Mr. Chiesa at which time you advised him that Local 17 people would not go to work on the morning of May 31?

"*A*. Well we had a telephone conversation.

"*Q*. Answer the question. Yes or no?

"*Mr. O'Hare:* I think the witness is entitled to answer the question in his own fashion.

"*Referee:* It calls for a yes or no answer.

"*A*. Yes, I had a telephone conversation.

"*Q*. Did you not tell Mr. Chiesa in that telephone conversation that the men of Local 17, who were working for Myers, would be removed from all line

construction operations and line clearance operations on Tuesday morning, May 31, 1966?

"*A*. Not directly, no.

"*Q*. How did you tell him that if you didn't tell him directly?

"*A*. Again this was an assumed thing, through the course of negotiations.

"*Referee:* This is with respect to a telephone conversation, and it is outside of the negotiation area?

"*A*. That is correct, but the conversation was directly tied into the assumptions that were reached at the negotiations.

"*Q*. I would like to have the record noted there is considerable backing and filling at this point.

"*Mr. O'Hare:* I object.

"*Q*. My question is simply this, in your telephone conversation with Mr. Chiesa on May 28, did you tell him that all men working for Myers who were members of Local 17 would not go to work on Tuesday morning, May 31?

"*A*. To answer yes or no it would be utterly impossible to answer the question yes or no.

"*Q*. Why would it be utterly impossible, based on the telephone conversation that you had with Mr. Chiesa on May 28 concerning whether or not the Myers 17 people would work?

"*A*. Well because I recollect the telephone call but I don't recollect the direct conversation as to what was said or not said.

"*Q*. If Mr. Chiesa testified under oath that you did in fact tell him that members of Local 17 would not work for Myers on the morning of May 31, would he be lying?

"*A*. No.

"*Q*. Would you be lying if you said you didn't tell Mr. Chiesa that local men, men of Local 17 would not work for L. E. Myers on May 31, 1966?

"*A*. Well again this would be a hard question to answer yes or no.

*"Referee:* I think the witness answered, he said he cannot recall.

*"Q.* Mr. Oliver, let me ask you this. You have been in negotiation work for IBEW for a number of years?

*"A.* Yes.

*"Q.* You are fully aware of investment and equipment and property that the various employers have, for whom your men work?

*"A.* That is correct."

Exhibit 14 admitted into evidence was distributed on behalf of defendant Myers by Mr. Chiesa to the foremen on May 31. It was addressed "to all employees" and in part, stated as follows:

"The L. E. Myers Co. has been notified by Local Union No 17 that they will remove our employees from the job on Tuesday, May 31, 1966, if they don't settle. They did not settle. It is our understanding that you too, have been notified by your steward or a representative of Local Union No 17 that you are not to go to work this morning."

Plaintiffs Jozwik, Dunn, and Breiholz were among the 50 employees at their job-reporting location on the morning of May 31 when the letter was read by the foreman. The statement in the letter was never denied or refuted by the union or the employees, including the claimants who filled out the forms as requested by the letter. The company relied upon Mr. Oliver's statement and understandably took steps to provide an orderly cessation of work and protection of its property. Plaintiffs Jozwik, Breiholz, Dunn, Schaffhauser, and McCoy all testified. Their testimony indicated that they received no orders from the union not to go to work. It could be inferred from their testimony that the plaintiffs were laid off by defendant during the period in question.

Although it is true that possibly the referee could have come to another determination under the evidence as submitted, we are constrained under the facts in this case to determine that the referee came to his determination supported by competent, material, and substantial evidence on the whole record.

Affirmed. No costs, construction of a statute being involved.

All concurred.