BOLLES *v.* EMPLOYMENT SECURITY COMMISSION.

1. UNEMPLOYMENT COMPENSATION—INTENT OF EMPLOYMENT SECURITY ACT.

   The intent of the employment security act is not to supply anyone a supplemental income but rather to furnish protection against the hazard of involuntary unemployment through the systematic accumulation of funds during employment to be disbursed to the involuntarily unemployed in times of need, to maintain purchasing power and to limit the serious social consequences of relief assistance (CL 1948, § 421.2).

2. SAME—INTENT OF EMPLOYMENT SECURITY ACT.

   The employment security act was not intended to place a premium on idleness, to stifle initiative, or to penalize a laid-off worker's attempt to make his time economically productive (CL 1948, § 421.1 *et seq.*, as amended).

3. SAME—SELF-EMPLOYMENT—DISQUALIFICATION FOR BENEFITS.

   The mere fact that an employee who has been laid off from his customary employment enters into self-employment in some occupation from which a living is customarily derived would not alone be sufficient to disqualify him from receiving benefits under the act irrespective of the amount earned at the self-employment (CLS 1956, §§ 421.27[c], 421.28, 421.29).

4. SAME—SELF-EMPLOYMENT—AMOUNT OF REMUNERATION—DISQUALIFICATION FOR BENEFITS.

   Two employees of motor manufacturer who were laid off from their jobs after having become qualified to receive unemployment benefits under the employment security act were not disqualified from receiving such benefits by reason of the fact that they opened a watch repair shop and each received an

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 10.
[3, 4] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 34.
Right to unemployment compensation of one working on his own projects or activities. 65 ALR2d 1182.
[5] 14 Am Jur, Costs § 23.

average of perhaps $1 a day, where they registered and were available for work, unsuccessfully sought other employment, and eventually returned to work for their employer (CL 1948, § 421.1 *et seq.*, as amended; CLS 1956, §§ 421.28, 421.29, 421.48).

5. Costs—Public Question—Unemployment Compensation.

No costs are allowed in proceeding to determine whether or not plaintiffs who became self-employed during period of layoff were entitled to unemployment compensation benefits irrespective of amount of remuneration received, a public question being involved (CL 1948, § 421.1 *et seq.*; CLS 1956, §§ 421.28, 421.29, 421.48).

Appeal from Muskegon; Roth (Stephen J.), J., presiding. Submitted June 8, 1960. (Docket Nos. 17, 18, Calendar Nos. 48,169, 48,170.) Decided September 16, 1960.

Claims by Lewis F. Bolles and Charles J. Sabin, employees of Continental Motors Corporation, a Virginia corporation, for unemployment compensation benefits were denied by the Michigan Employment Security Commission and its Appeal Board. On certiorari, orders set aside and claims remanded for determination and allowance of benefits. Defendant commission appeals combined cases. Affirmed.

*Marcus, Kelman, Loria, McCroskey & Finucan (Jerry S. McCroskey,* of counsel), for plaintiffs.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, and *Arthur W. Brown,* Assistant Attorney General, for defendant commission.

Smith, J. This case[1] involves unemployment compensation. In general terms the problem is this: How can a man use his time, when he is laid off, and still not lose his unemployment compensation? At

---

[1] Actually, there are 2 cases before us, combined for submission and argument on appeal to this Court.

one extreme the problem is clear. If he goes fishing, or sits on the porch and whittles, he is safe. But if he works, a real problem arises. Let us assume he is a good lawn mower. It is argued to us that if he goes to work as an employee of a lawn mowing company, he is still safe, but that if he mows lawns on his own, he loses his compensation. The cliche is that if he is self-employed he is not unemployed. Why not?

There is no dispute over the controlling facts. The appellees were employees of the Continental Motors Corporation, of Muskegon. They were laid off for lack of work in August and September of 1955. Each had been trained in watch repair work and each had at one time or another engaged in this occupation. Consequently, they pooled their resources, rented a building, remodeled and redecorated it, and opened it for business on November 1, 1955, under the name of Muskegon Jewelers. They advertised and they did what work they could get. It wasn't much. Each averaged about a dollar a day over the period in question.

Appellee Bolles returned to work on January 3, 1956, in response to an offer from the Norge Company, and at the time of the hearing (February 16th) had regained his old job with Continental Motors. Appellee Sabin was recalled by Continental just before Thanksgiving (but was laid off the day after Thanksgiving) and again on January 10, 1956. At the time of the hearing Sabin was tending the store in the morning, his mother in the afternoon, and Bolles after work in the evening.

During the period of 7 weeks' operation from October 30th through December 17th, the period here involved, the claimants reported a total gain each of around $60, although some doubt is cast upon the accuracy of such figure as "gain" since additional expenses of almost the same amount had not been

included in the computation. During this same period both appellees were actively seeking work in industry, both applied, unsuccessfully, for jobs referred to them by the employment security commission, and both drew their unemployment compensation.

It was the commission's position that neither man had been unemployed after the store was opened, and hence must make restitution of unemployment benefits received. The referee, and the appeal board, held in favor of the commission, the latter concluding that neither was "an unemployed individual and accordingly [neither was] * * * entitled to receive unemployment benefits for the period from October 30, 1955, through December 17, 1955." ·

The circuit court, upon appeal, reversed.[2] It was not the legislative intent, it was held, to discourage industry and self-help during a lay-off period, but, rather, the contrary. The claimants were held to be entitled to unemployment benefits, "provided their remuneration does not exceed the standards set forth in the act," and the cause was remanded to the commission for such determination. Appellants are before us on a general appeal, a motion for certification of the cause as involving more than $500 having been heard by the trial court,[3] the cause so certified, and no challenge thereto made in the circuit, or by motion in this court.[4]

---

[2] The application of substantially undisputed facts to the statute is, of course, a matter of statutory construction and hence for the courts. *Ford Motor Co.* v. *Unemployment Compensation Commission,* 316 Mich 468; *Hubbard* v. *Unemployment Compensation Commission,* 328 Mich 444, 449.

[3] Michigan Court Rule No 60 (1945).

[4] It was stipulated below in the Sabin case that "should the [trial] court conclude on submission of said question of certification that less than $500 is actually involved in said controversy, that said appellee will waive any and all right of objection as to the timeliness of any delayed application for leave to appeal provided same is filed and served upon said appellant (*sic*) within 20 days after any such disposition or order pertaining to certification is made by the circuit judge."

The act to be construed is the Michigan employment security act.[5] Its counterparts, outgrowths of the depression of the early 1930's, will be found in one form or another in all the States of the Union. All courts would agree that the legislatures did not intend thereby to supply anyone a supplemental income. Rather, it was intended, in the words of the act, to furnish "protection against this hazard [one of involuntary unemployment]" through the systematic accumulation of funds during employment to be disbursed to the involuntarily unemployed in times of need, "thus maintaining purchasing power and limiting the serious social consequences of relief assistance."[6] On the other hand, all courts would undoubtedly agree that the act was not intended to place a premium on idleness, to stifle initiative, or to penalize a laid-off worker's attempt to make his time economically productive.

So much is agreed. What is not agreed, however, is the manner and capacity in which a laid-off workman can make use of his time without forfeiting his unemployment compensation benefits. It is the commission's position that the claimants before us were "both employed in the partnership business and were, therefore, neither unemployed nor eligible for benefits." Why the "therefore"? Because, it is said, a living is customarily derived from the activity they attempted, and hence they "cannot" be regarded as unemployed. So far I see nothing but words without reasons. I would assume that a "living is customarily derived" from any gainful occupation. If this be the test, an unemployed workman would be well advised not to seek work lest he find it in some occupation from which a living is customarily derived. Yet the act requires that he continue "seeking

---

[5] CL 1948 and CLS 1956, § 421.1 et seq. (Stat Ann 1960 Rev § 17,501 et seq.).
[6] CL 1948, § 421.2 (Stat Ann 1960 Rev § 17.502).

work"[7] to remain eligible for compensation, and occupations from which livings are not customarily derived cannot be numerous in a world in which most must work for a living.

But this does not exhaust the appellees' alleged errors. Rather than working for wages for another (the record does not disclose whether or not such jobs were available), they started out on their own. In other words, instead of being employed by another they became self-employed. Just at this point we are unable to comprehend how they may have hurt their status. The act does not forbid self-employment, as we shall see. Nor does the portion of the act defining how much an individual shall draw in compensation should he find work elsewhere[8] forbid self-employment or discriminate against it. The State would argue that the earnings from self-employment may be "profit or loss" but are not "remunerations." This we reject. The administration of the act is not controlled by accountant's definitions but by human need. Furthermore, the act itself defines remuneration as "all compensation paid for personal services,"[9] and personal services for pay are precisely what these self-employed persons did render.

Actually, what the claimants have run afoul of is not the act itself, not even literal words of the act, but a catch-phrase: "One who is self-employed is

[7] CLS 1956, § 421.28, subd (a) (Stat Ann 1960 Rev § 17.530, subd [a]).

[8] Section 27, subd (c) of the act provides in part as follows:

"Subject to the provisions of subsection (g) of this section, each eligible individual shall be paid his weekly benefit rate with respect to the week for which he earns or receives no remuneration or remuneration equal to less than 1/2 his weekly benefit rate, or shall be paid 1/2 his weekly benefit rate with respect to the week for which he earns or receives remuneration equal to at least 1/2 but less than his weekly benefit rate." CLS 1956, § 421.27, subd (c) (Stat Ann 1955 Cum Supp § 17.529, subd [c]).

[9] CLS 1956, § 421.44, subd (1) (Stat Ann 1960 Rev § 17.548, subd [1]).

not unemployed". Why not? Isn't the unemployed workman who tries to sell a few Christmas cards to better his lot still unemployed? True, he is self-employed in a technical, legal sense, as to his Christmas-card enterprise, but does this circumstance automatically disqualify him in some way? If so, it is not made clear to us why, particularly since the act itself provides that if any unemployed workman has some available form of self-employment, he must return to it when directed by the commission[10] or be disqualified from benefits. Yet if it is literally true, sled-length, that "one self-employed is not unemployed," his mere return to his customary self-employment (as directed) will automatically disqualify him from benefits as a matter of case law, whatever his remuneration therefrom may be. If he does not return, then, he is disqualified by the act, and if he does he is disqualified by the courts.

It is obvious that we must go deeper than such arguments if the act is to accomplish its remedial purposes and at the same time not be defeated by unwarranted depredations upon its resources. The answer may be found within its 4 corners. First to be noted are those sections of the act setting up the qualifying requirements for coverage under the act, *e.g.*, the claimant must have worked a certain number of weeks, earning wages in excess of a specified amount.[11] These and similar provisions are inserted in the acts, according to Larson and Murray's study of unemployment insurance, in order to "limit benefits to claimants who have had substantial and

---

[10] "An individual shall be disqualified for benefits: (a) For the duration of his unemployment in all cases where the individual has: * * * (5) failed without good cause to accept suitable work when offered him, or to return to his customary self-employment, if any, when so directed by the employment office or the commission." CLS 1956, § 421.29, subd (1)(a)(5) (Stat Ann 1960 Rev § 17.531, subd [1][a][5]).

[11] CLS 1956, §§ 421.28, 421.46 (Stat Ann 1960 Rev §§ 17.530, 17.550).

recent attachment to the covered labor force and ordinarily depend upon wages for their livelihood."[12] Such, also, is the purpose of the requirement (for eligibility to benefits) that a claimant be "able and available" to work, that he register for work, and seek work.[13]  These, also, are indicia of genuine attachment to the labor market.[14]  Riesenfeld's study of unemployment insurance[15] leads him to a similar conclusion, namely, that: "There is  *  *  *  widespread agreement that merely temporary, transitional or casual affiliation with the labor force does not suffice  *  *  *  and that more substantial connection must be looked for."  The language of the cases reflects the same controlling consideration, e.g., *Dwyer v. Unemployment Compensation Commission,* 321 Mich 178, 188, which speaks of "persons who are genuinely attached to the labor market."

Without undertaking a detailed analysis of cases cited pro and con, reconcilable, in the main, on their facts, suffice it to say that the test properly to be employed is that of genuine attachment to the labor market.  This test will serve to differentiate the business or professional man, who temporarily attaches himself to the industrial market, from the workman who seeks a temporary augmentation of funds in a period of lay-off.  Here, in our opinion, is the explanation of such cases as *Phillips v. Unemployment Compensation Commission,* 323 Mich 188, in which compensation was denied a lawyer of 45 years' experience who, after undertaking industrial war work, had reopened his law office and thereafter, when laid off, sought unemployment benefit.  This, at the most,

---

[12] Larson and Murray, The Development of Unemployment Insurance in the United States, 8 Vand L Rev 181, 215.

[13] CLS 1956, § 421.28 (Stat Ann 1960 Rev § 17.530).

[14] See Freeman, Availability—Active Search for Work, 10 Ohio St LJ 181.

[15] Riesenfeld, The Place of Unemployment Insurance Within the Patterns and Policies of Protection Against Wage-Loss, 8 Vand L Rev 218, 232.

was transitional industrial work. To be contrasted is the situation in *People* v. *Nest,* 53 Cal App 2d Supp 856 (128 P2d 444), in which a workman tried, with even less success than the claimants before us (Mr. Nest lost some $1,200 in the venture) to start a clothing business. The court stressed his ability to work and his continued availability for work (*i.e.,* his genuine attachment to the labor market), finally concluding that he had not offended the unemployment insurance act in certifying as to his total and partial unemployment. It was not the intention of the legislature, held the court, "to discourage citizens out of employment from making early and earnest attempts to re-establish themselves economically to avoid becoming or continuing to be charges on society." *Id.* at 860 (128 P2d at 446). Thus the *Phillips* and *Nest Cases,* while reaching opposite results, are not in conflict.

The claimants before us, subsequent to their layoff, continued seeking work. Each of them accepted referrals to other industrial employment. Each was ready, willing, able, and anxious to continue work in industry. They were genuinely attached to the labor market, neither casually nor as a matter of transition. Their meager efforts to augment their unemployment checks did not break their genuine attachment to the labor market. They were "unemployed" within the meaning of the act (section 48[16]), they were eligible under the act (section 28[17]), and they were in no manner disqualified for benefits (section 29[18]). The circuit judge's disposition of the case was correct. Both the language of the act and its obvious intent foster and encourage industry and self-help rather than idleness and inactivity.

---

[16] CLS 1956, § 421.48 (Stat Ann 1960 Rev § 17.552).
[17] CLS 1956, § 421.28 (Stat Ann 1960 Rev § 17.530).
[18] CLS 1956, § 421.29 (Stat Ann 1960 Rev § 17.531).

The order below is affirmed.   No costs, a public question.

Dethmers, C. J., and Carr, Kelly, Black, Edwards, Kavanagh, and Souris, JJ., concurred.