VICKERS v. EMPLOYMENT SECURITY COMMISSION

1. UNEMPLOYMENT COMPENSATION—UNEMPLOYED STATUS—STATUTES.
   Plaintiffs, employees of a power line clearance company which had a contract with the Detroit Edison Company, were not entitled to unemployment benefits where the union that the plaintiffs belonged to also had members doing similar work employed by Detroit Edison, the union struck Edison, plaintiffs' employer received a request from a union official asking that employees not work on Edison property, the plaintiffs' employer consented to the request, but required the union to tell the men not to work on Edison property, the labor contract between plaintiffs' union and employer provided that the union could remove its members who were employed by the plaintiffs' employer in case of a strike with Edison, work was available for the plaintiffs during the Edison strike on non-Edison property, the plaintiffs knew work was available but did not report for work, the plaintiffs' employer did not call the plaintiffs for the available work, because it was afraid that that action would be a breach of contract, and there were no pickets on the job sites shut down by the strike, because the plaintiffs were not unemployed, as defined by the applicable statute, in that their failure to work was not caused by the failure of their employer to furnish full time work (MCLA § 421.48).

2. UNEMPLOYMENT COMPENSATION—REQUIREMENTS—UNEMPLOYMENT STATUS—STATUTES.
   A claimant is not entitled to unemployment benefits unless he first establishes that he was unemployed; unemployment is

---

REFERENCES FOR POINTS IN HEADNOTES
[1] Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes.    28 ALR2d 287.
[1, 2] 48 Am Jur, Social Security, Unemployment Insurance and Retirement Funds § 36.
[3] 29 Am Jur 2d, Evidence §§ 496, 497

the indispensable essential element or ingredient which brings into being and sets into motion all of the other provisions of the Employment Security Act (MCLA § 421.1 *et seq.*).

3. EVIDENCE—HEARSAY—EXCEPTIONS—UNION OFFICIALS.
   Testimony by an officer of plaintiff unemployment benefit claimants' employer concerning statements made by the business manager of the claimants' union and the business manager's assistant relating to the claimants' employment was admissible where the business manager and his assistant were by a union agreement authorized to speak for the claimants in matters pertaining to employment.

Appeal from Wayne, Edward S. Piggins, J. Submitted Division 1 December 9, 1970, at Detroit. (Docket Nos. 7914, 7915, 7916.)   Decided February 16, 1971.

Claims by Victor L. Vickers, Dazell Williams, and Ples Williams for unemployment compensation against Asplundh Tree Expert Company were denied by the Michigan Employment Security Commission.   Plaintiffs appealed to circuit court.   Affirmed.   Plaintiffs appeal.   Affirmed.

*Rothe, Marston, Mazey, Sachs & O'Connell* (by *Rolland R. O'Hare*), for plaintiffs.

*Butzel, Eaman, Long, Gust & Kennedy* (by *Leslie W. Fleming*), for defendant Asplundh Tree Expert Company.

*Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, and *Francis W. Edwards*, Assistant Attorney General, for defendant Employment Security Commission.

Before: DANHOF, P. J., and HOLBROOK and VANDER WAL,* JJ.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

HOLBROOK, J.   This appeal involves the rights of three plaintiffs, employees of defendant Asplundh Tree Expert Company, claimants under the provisions of the Michigan Employment Security Act.[1] Plaintiffs were denied unemployment benefits by determination of the commission, a redetermination of the commission, and a decision by a referee of the commission,[2] after a hearing and the finding of facts, on the determination that plaintiffs were ineligible under the terms of the act.   Plaintiffs appealed to the Michigan Employment Security Commission Appeal Board which affirmed the decision and findings of the referee.   An appeal was then taken from the appeal board to the Circuit Court for Wayne County,[3] and the Honorable Edward S. Piggins, in an opinion, affirmed the appeal board.   Plaintiffs appeal to this Court by right and raise two issues which we restate as follows:   (1) May the Employment Security Commission deny a claim for benefits when it finds that the claimants are not "unemployed" within the meaning of section 48[4] of the Michigan Employment Security Act?   (2) Are the findings of fact made by the appeal board supported by competent, material, and substantial evidence on the whole record?

The Wayne County Circuit Court in considering the appeal of plaintiffs was required to review the proceedings in accordance with the provisions of section 38 of the act which provides in part as follows:[5]

"The circuit court of the county in which the claimant resides, or, if no claimant is a party to the

---

[1] PA 1936 (Ex Sess), No 1, as amended, MCLA § 421.1 *et seq.* (Stat Ann 1968 Rev § 17.501 *et seq.*).
[2] MCLA § 421.32a (Stat Ann 1968 Rev § 17.534[1]).
[3] MCLA § 421.38 (Stat Ann 1968 Rev § 17.540).
[4] MCLA § 421.48 (Stat Ann 1968 Rev § 17.552).
[5] MCLA § 421.38 (Stat Ann 1968 Rev § 17.540).

case, the circuit court of the county in which the
employer's principal place of business in Michigan
is located, or in any case the circuit court for the
county of Ingham, shall have power to review ques-
tions of fact and law on the record made before
the referee and the appeal board involved in any
such final order or decision of said appeal board,
and to make such further orders in respect thereto
as justice may require, but said court may reverse
such order or decision only if it finds that such
order or decision is contrary to law or is not sup-
ported by competent, material and substantial evi-
dence on the whole record."

We have reviewed the findings of the referee in
the matter, and because we believe they are accurate,
we reiterate them here as the pertinent facts in
this case.

"Asplundh Tree Expert Company, hereinafter
sometimes referred to as 'Asplundh', of Jenkintown,
Pennsylvania, is engaged in power line clearance
work in various states of the United States, under
contracts with public utilities, clearing areas for new
erection.  It had such a contract with the Detroit
Edison Company, hereinafter sometimes referred
to as 'Edison', in 1966.

"Asplundh has a labor contract with Local Union
#17 of the International Brotherhood of Electrical
Workers, AFL-CIO, hereinafter sometimes referred
to as 'Union' or 'Local #17' (Exhibit #10).  This
contract covered the employees of Asplundh who
were engaged in such power line clearance work;
they worked on properties belonging to Edison.

"Edison had a union labor contract with Local
#17 covering its employees engaged in like power
line clearance work.

"The Edison contract was to expire May 31, 1966.
Negotiations for a new contract were going on in
May, 1966.  The parties did not agree on the terms

of a new agreement and a strike was called by the union on May 31, 1966.

"On the morning of May 31, 1966, the union informed Asplundh that Local #17 was on strike against Edison. Asplundh had work for its employees on May 31 and notified its local (Michigan area) manager to proceed with Asplundh's work. Ninety percent of Asplundh's line clearance workers, a 'normal' attendance, reported for work at the usual morning hour on May 31. Edison had not requested Asplundh to refrain from its work on Edison property. Asplundh did not tell its employees not to work; Asplundh proceeded with its work. Some of its employees who reported for work on May 31 and on June 1 did work.

"Although the labor contract provides for 'showup time' payment for four hours time if an employee reports for work and the employer is unable to furnish work, those employees who reported for work on May 31 and did not work were not paid for 'showup time' because employer did have work for them. Pay for 'showup time' was not requested by the employees; no grievance (provided for in the contract) was filed in protest of the nonpayment of 'showup time'.

"Similarly, the contract provides for payment of 'holiday pay' where the employees work on the day before and after the holiday when work is available. Those individuals who did not work on May 31, 1966, were not paid 'holiday pay' for Memorial Day because of their failure to work when work was available on May 31.

"Employer received a telephone request from James Oliver, business manager of Local #17, not to permit Local #17 members (employees of Asplundh) to work (on Edison property) on account of the strike; there 'might be some violence, if they worked', and the Asplundh employees 'may gain from the strike' by the Edison employees. Employer yielded, but required Mr. Oliver to tell the men not to work.

"The labor contract (Exhibit #10) contains a provision permitting the union to remove its members, employees of Asplundh, to help the union in its strike against Edison:

" 'This agreement does not deny the right of the union or its representatives to render assistance to other labor organizations within the jurisdiction of this local as provided and defined in this agreement, by removal of its members from jobs where necessary and when the union or its proper representative decides to do so; but no removal shall take place until notice is first given to the employer involved.'

"The Edison strike was settled on July 3, and Asplundh's employees reported for work on July 5, and the work was resumed.

"During the work stoppage, all of employer's equipment was idle, parked and locked, waiting for word from the union when the men may work.

"Work was available for each of the claimants during the period of the strike; they knew the work was available, but did not report for work; the union did not want them to work. If its employees had not stopped their work, their work was available for the entire year; Asplundh did not depend on Edison for materials or equipment; it operates with its own vehicles.

"Employer did not call claimants in for the available work, for fear it would be considered in breach of the contract which permitted the union to take the men off the work in support of the strike by its members against Edison.

"Employer did have one job to do during the period of the strike; this was in Milford, Michigan, and this job was performed with employees of Asplundh who were members of Local #17; it was not a job on Edison property.

"Employer showed there were no pickets on the job sites which were shut down by the strike.

"Claimant Vickers said he reported on May 31, ready for work, at his reporting station, at Conners and Wade; his supervisor, Elmo Jensen, told him

(and his crew) of the Edison strike and said not to go to work. He saw no pickets. He was not told by the company to continue with his work. He was paid holiday pay for May 31, 1966.

"Claimant Leone worked all day May 31, but did not work on June 1. He was told by his foreman, who is also a member of Local #17, on May 31, shortly after 3 p.m., to 'fold it up'; he continued to the end of the shift to 4 p.m. There was no picket on the job. He was called by employer to work on the Milford job; he did not accept the work, he was busy with repair work around his own home; also, the rate on the Milford job was $2 per hour, compared to $3.30 per hour on his regular work. Since claimant did not work on July 1, he was not entitled to holiday pay for July 4. However, on the insistence of the union and because claimant worked on May 31, he was issued holiday pay for July 4, for six hours (not a full eight-hour day); employer was willing to pay for a half day, four hours, but compromised with the union, who insisted on eight-hour pay by making the payment for six hours, as a 'favor' to claimant.

"In rebuttal employer showed that claimant Vickers was given holiday pay for Memorial Day in error. Employer also made some July 4 holiday payments at the request of the union as a 'nice gesture'.

"Employer denied instructing its employees not to work on account of the Edison strike.

### "Findings, Reasons, and Conclusions

"The primary question in this case pertains to the unemployment of Asplundh employees, the claimants herein, in the period from May 31 through July 3, 1966, and their eligibility for benefits in said period.

"Under the redetermination issued by the commission, the claimants were not considered unemployed in that period because of a labor dispute in

active progress in the Asplundh establishment, because the labor dispute which was in active progress in the establishment of Edison, was a labor dispute in an establishment which did not belong to the same employing unit (Asplundh) by whom the claimants were employed.

"Section 29(8) of the act reads in part as follows:

" 'Sec. 29. (8) An individual shall be disqualified for benefits for any week with respect to which his total or partial unemployment is due to a labor dispute in active progress  *  *  *  in the establishment in which he is or was last employed, or to a labor dispute  *  *  *  in active progress  *  *  *  in any other establishment within the United States which is functionally integrated with such establishment and is operated by the same employing unit.'

"The fact that Edison and Asplundh each hold union contracts with the same union, Local #17, is coincidental, and complicates the situation; but that does not create a unity of entity of the two employing units; therefore, the fact that both have like labor contracts with one union, is held immaterial and not controlling of the issue.

"The commission's finding that the claimants were not subject to a disqualification for benefits under the labor dispute provisions of the Michigan Employment Security Act, is held to be correct and must be sustained.

"Reference is made in the redetermination to the provisions of sections 27(c) and 48 of the act. Section 27(c) contains the formula for the computation and payment of benefits to an individual who is otherwise qualified to receive unemployment compensation. Section 48 defines the term 'unemployed' as having reference to any week during which the individual performs no services and with respect to which no remuneration is payable to him. Section 48, however, contains the following proviso:

" 'Provided that any loss of remuneration incurred by an individual during any week resulting from

any cause other than the failure of his employing unit to furnish full-time regular employment shall be included as remuneration earned for purposes of this section and of section (c) of section 27 of this act.'

"It is found that the claimants did not proceed with their work on May 31, not for lack of available suitable work with their regular employer, but by reason of a common consent and understanding that they were not to work but to remain off work in support of their Local #17 members who were on strike with Edison.

"It is very evident on the record of this case that the Local #17 members, employees of Asplundh, required no specific instruction from their union officials to advise them, or to prevent them from proceeding with the Asplundh work on Edison property. It is equally clear that it was entirely unnecessary for Asplundh to give their employees, members of Local #17, any other message than the fact that Local #17 members were striking against Edison; the willingness by Asplundh to continue with the work was not sufficient to keep claimants on the job. Union solidarity and sympathy support governed their actions. This attitude and understanding permeates the entire record in this appeal.

"Significantly, and regardless of the expressed or assumed wishes of Edison, the union, fully aware that the claimants could work under the Asplundh contract because their work was available, gave no instructions to the claimants to ignore the strike of the Local #17 members against Edison because there was no strike against Asplundh.

"In view of the authority contained in the union contract (Exhibit #10), to remove Local #17 members, employees of Asplundh, in support of Local #17 members on strike with Edison, a duty devolved upon the union officials to instruct its Local #17 members who were employees of Asplundh, that the union does not want them to stop working because

of the strike against Edison, except as it suited the union's purpose and plan that they should not work.

"In other words, the Asplundh employees, members of Local #17, did not require any instructions not to work; they did require a specific instruction from their union, to work.  The failure to give those individuals and the claimants herein, such instructions, was tantamount to an act on the part of the union, removing them from their jobs in sympathy with the strikers.

"On the basis of the foregoing conclusions, it is found that the claimants herein did, in fact, lose the benefit of employment in available work and earnings with their regular employer, Asplundh Tree Expert Company, during the period of the Edison strike, for reasons other than the employer's failure to furnish full-time regular work, and they are held ineligible for benefits.  The commission's finding to this effect must be sustained."

# I

The appeal board's decision and the Wayne County Circuit Court's affirmance both relied on the provisions of § 48 of the act in determining that the plaintiffs were ineligible for benefits.  Section 48[6] states in part as follows:

"An individual shall be deemed 'unemployed' with respect to any week during which he performs no services and with respect to which no remuneration is payable to him, or with respect to any week of less than full-time work if the remuneration payable to him is less than his weekly benefit rate: Provided, That any loss of remuneration incurred by an individual during any week resulting from any cause other than the failure of his employing unit to furnish full-time, regular employment shall be included as remuneration earned for purposes of this

---

[6] MCLA § 421.48 (Stat Ann 1968 Rev § 17.552).

section and of subsection (c) of section 27 of this act: Provided further, That the total amount of remuneration thus lost shall be determined in such manner as the commission shall by regulation prescribe. For the purposes of this act, an individual's weekly benefit rate shall mean the weekly benefit rate shown in the table in section 27(b), which is applicable to the individual.

\*     \*     \*

"An individual shall not be deemed to be unemployed during any leave of absence from work granted by an employer either at the request of the individual or pursuant to an agreement with his duly authorized bargaining agent, or in accordance with law."

Plaintiffs assert that they were eligible for benefits under the criteria established in § 28 and not disqualified under the provisions of § 29 of the act and were, therefore, entitled to the benefits provided under the terms of the act. Plaintiffs cite the cases of *Great Lakes Steel Corporation* v. *Employment Security Commission* (1967), 6 Mich App 656, *affirmed* by the Supreme Court in 381 Mich 249, and *Bolles* v. *Employment Security Commission* (1960), 361 Mich 378, as authority for its position that § 48 of the act should not be used to defeat a claimant who is qualified under § 28 and not disqualified under § 29 of the act. Neither case upholds plaintiffs' position on the law. *Bolles, supra,* held simply that an individual who, during the course of a layoff, pursues self-employment out of which he derives little or no monetary gain is unemployed within the meaning of § 48. *Great Lakes, supra,* involved a number of employees who, during the course of a labor dispute at the Great Lakes establishment, had obtained interim employment with other employers who subsequently laid them off for lack of work. The Court held that the interim employer rather

than Great Lakes was the "employing unit" within the meaning of that proviso in the act.

Judges Piggins stated in part in his opinion as follows:

"Section 28 provides in the first sentence 'an unemployed individual shall be eligible' and § 29 in its first line states, 'An individual shall be disqualified.' Clearly if a state of unemployment as defined by the act exists and the individuals involved are eligible in accordance with § 28 and are not disqualified in accordance with § 29, they are entitled to benefits. *But the primary mandatory prerequisite in any instance, the key that unlocks the floodgates, is the existence of a state of unemployment.* If no unemployment, then no benefits could arise, in any event, regardless of qualifications or eligibility. Unemployment is the indispensable, essential element or ingredient which brings into being and sets into motion all of the other provisions of the act. The operation of the act is dependent entirely upon the existence of a status of unemployment as it is defined in the act. Section 48 is one of the most vital sections of the act. It clearly and necessarily spells out and defines when an individual shall be deemed unemployed. The proviso in the first paragraph of § 48 is the key, 'provided, that any loss of remuneration incurred by an individual during any week resulting from any cause other than the failure of his employing unit to furnish full time, regular employment shall be included as remuneration earned for purposes of this section and of subsection (c) of section 27 of this act.' "

The case of *Employment Security Commission v. Vulcan Forging Company* (1965), 375 Mich 374, 378, persuades us to agree with Judge Piggins.

"Our conclusion is buttressed by the second paragraph of the amended section [48] which, among other things, provides that vacation pay received for such periods of unemployment is considered re-

muneration in determining whether an employee is unemployed and in determining the amount of unemployment compensation benefits, under § 27 of the act, to which he is entitled."

We rule that § 48 of the act is valid and applicable to the plaintiffs herein.

## II

Plaintiffs assert that the findings of fact made by the Michigan Employment Security Commission's referee were not supported by competent, material, and substantial evidence on the whole record. They also claim that the testimony of Dudley W. Jordan, defendant's vice-president, and Werner Lange, its area manager, is hearsay. Mr. Jordan testified in part:

"*Q.* Now going back to May 31, you testified you did not tell any of your men not to go to work. Is that correct?

"*A.* That is right.

"*Q.* Did you tell any of your supervisory people not to tell the men to go to work?

"*A.* Wait a minute. That is a double negative.

"*Referee:* That is right.

"*Q.* (*By Mr. Spittler [for Asplundh]*): Did you tell any of your supervisory people to keep the men away from work?

"*A.* No.

"*Q.* Did anyone at the Detroit Edison tell you to keep your men away from work?

"*A.* No.

"*Q.* Did you have any conversation with Jim Oliver of Local No 17 on May 31, 1966, about the fact that your men were not working?

"*A.* Yes.

"*Q.* What was the nature of that conversation?

"*A.* Jim Oliver called me by telephone from Detroit—I mean Columbus. He said, 'I believe that

you probably have been advised that Local No 17 is on strike for the Detroit Edison Company'. He said further that he heard that a number of our crews were working; but that he did not want them to work. I said I could feel there was no pressure, pro or con, economic or otherwise, that could support or favor his cause or be against his cause if our men were to continue working. I told him that in two or three occasions in the past that we had had similar situations and that we had been permitted to continue working.

"*Q.* Were they similar situations with Detroit Edison or other utility company?

"*A.* Other utility companies.

"*Q.* And your men had been permitted to work?

"*A.* Yes.

"*Q.* What did Mr. Oliver reply to that?

"*A.* He said, 'In this case we do not want the men to work. In the first place we do not want any violence which could possibly occur'. And he further said, 'Our men might have some economic gain in support of the Detroit Edison dispute because of the pattern of wages and other conditions that follow in future negotiations'.

"However, there were three people based on the Detroit—

"*Q.* Did you agree with Mr. Oliver that your men would not work?

"*A.* I said, 'That is your decision', and that if the men are not going to work he is to advise them. I wouldn't.

"*Q.* Did you tell him that you had the work available to do?

"*A.* I said, 'We are under obligation to the Detroit Edison Company to continue to perform work.'

"*Q.* Did you have any later conversation with anyone else, Mr. Oliver or heirarchy of Local No 17 on May 31, about the situation?

"*A.* In the fifth week of the strike I called Local No 17. I called for Mr. Oliver. He was not in. I talked to Mr. Stock—Russel Stock, who is Mr.

Oliver's assistant. I said that I thought the thing was getting into an untenable position, that we definitely were hurt, our men will be extremely hurt, and that we wanted to get some action and get back to work as soon as possible. I was a little provoked.

"*Q.* Did you have any satisfactory response from the union?

"*Mr. O'Hare:* Objection. That is a categorization of 'satisfactory'.

"*Mr. Jordan:* May I answer that?

"*Mr. Spittler:* Yes.

"*Referee:* With the omission of 'satisfactory'.

"*Mr. Jordan:* The retort to that plea of mine to the union was that they thought they saw a little bit of daylight in their proceedings with Detroit Edison and that this matter could possibly be brought to a conclusion within two or three days.

"*Q. (By Mr. Spittler):* Now did you or did you not, Mr. Jordan, continue to work after May 31, 1966, the date of the strike?

"*A.* Some of our men did.

"*Q.* But were they ultimately all stopped?

"*A.* Ultimately they were all stopped as indicated by our timesheets.

"*Q.* Again, going back to May 31, and thereafter, when the work was stopped, what did you do, if anything, with your equipment?

"*A.* We just parked it right where it was. We locked it up and waited on a day-to-day basis for notification that our men would return to work.

"*Q.* Were you ready to proceed with work at any time if the union would release the men?

"*A.* Absolutely.

"*Q.* You have testified that, first of all, when did you first go, next go back to work after May 31, after the work stoppage?

"*A.* Well, we went back to work on Tuesday, July 6, 1966.

"*Q.* You testified that—

"*A.* Pardon me. Tuesday, July—

"*Referee:* Tuesday is July 5.

"*Mr. Jordan:* The men did not return back to work July 5; but the two were to return to work the following day. I thought July 4 was on Sunday. They did return to work or could have returned on Tuesday, July 5.

"*Q. (By Mr. Spittler):* Now you have testified that the Asplundh Tree Expert Company has a contract with Local No 17, IBEW and that is the same Local No 17 that represents Edison and that Mr. Oliver is the business manager of this local. Is that correct?

"*A.* That is correct.

"*Q.* During 1966 and after the work stoppage of May 31 to July 5, was your company involved in any wage negotiations with Local No 17?

"*A.* During the work stoppage?

"*Q.* At the conclusion of the work stoppage but during the—was your company involved with any wage negotiations with Local No 17 in 1966?

"*A.* Yes.

"*Q.* What, if anything, had the Edison negotiations to do with your negotiations at the standpoint of the wages?

"*A.* Historically they very definitely have an outcome of our negotiations, because Edison negotiations with their people established a pattern. This pattern is normally or has a great deal of bearing on the outcome of the contractor's negotiations."

Mr. Oliver, the business manager of the union and his assistant, Mr. Stock, were, by virtue of the union agreement, the representatives of the employees of Asplundh and were authorized to speak for them in matters pertaining to their employment. The declarations of Mr. Oliver and Mr. Stock to Mr. Jordan to which he testified, are admissible as one of the exceptions to the hearsay rule. *Kalamazoo Yellow Cab Company* v. *Kalamazoo Circuit Judge* (1961), 363 Mich 384, 386.

Mr. Lange testified in part as follows:

"*Q.* Why did some of your men work on and after May 31 and some not, if you know?

"*A.* Some of them, in one case, in the Detroit Edison strike that came out on the job and told the foreman that 'This is it.'

"*Q.* What do you mean? What did he mean by that?

"*A.* To go and pack his tools and go back to the starting point. That is the place where our crew starts from.

"*Q.* So that all men ultimately stopped working and you know of an instance, at least one instance, where a Detroit Edison man told your men to get off the job. Is that correct?

"*A.* Right.

"*Q.* Disregarding the moment, the fact that your men didn't work in that period subsequent to May 31 and June 1st in there, how long could your men have worked on and after May 31, insofar as work to be done was concerned?

"*A.* The whole crew.

"*Q.* You had plenty of work for all the men that worked?

"*A.* Yes.

"*Q.* There is testimony that you had about 150 men on the payroll. Is that correct?

"*A.* Approximately. Yes.

"*Q.* Was the progress of your work dependent on any materials that you had to receive from Detroit Edison?

"*A.* No, no.

"*Q.* What, if anything, materials are necessary for you to run your Edison jobs?

"*A.* The equipment and material we have on our own trucks. We are self-contained. We don't need anything from Edison.

"*Q.* You buy no chemicals or anything from Edison or anything of that nature?

"*A.* No, sir.

"*Q.* You could work indefinitely without having any contact with Edison. Is that right, as far as materials are concerned?

"*A.* Yes, sir."

No representatives of the union were called to testify by plaintiffs as to whether they had issued instructions which would have kept the men from continuing on their jobs, nor to deny the statements that Mr. Jordan attributed to them.

The only witnesses sworn by the plaintiffs were Victor L. Vickers and Richard L. Leone. Leone, who is not a party to this appeal, stated that his foreman, Peter Zahria, stated that there would be no work and told him to go home. The record shows that Mr. Zahria was a member of Local No 17.

Victor L. Vickers, plaintiff herein, testified that Elmo Jensen, a foreman in charge of his and some other crews, advised that Local No 17 was on strike and there would be no work.

Although it is true that possibly the referee could have come to another determination under the evidence as submitted, we are required under the facts in this case to determine that the referee came to his determination supported by competent, material, and substantial evidence on the whole record.

Affirmed. No costs, construction of a statute being involved.

All concurred.